**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 18-cv-02420-CMA-MEH

GREGORY BOUDETTE, and
GARY MICKELSON,

       Plaintiffs,

v.

MATT BUFFINGTON
SHAWN SANDERS,
GLENN T. GAASCHE,
TOM QUINNETT, and
CITY OF CORTEZ,

       Defendants.

---

**ORDER AFFIRMING IN PART AND REJECTING IN PART THE JUNE 28, 2019
RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

---

This matter is before the Court on the Recommendation (Doc. # 81) of United

States Magistrate Judge Michael E. Hegarty, wherein he recommends that this Court:

- **grant** Defendants Quinnett and City of Cortez's Motion to Dismiss (Doc. # 22) **and** Defendant Sanders' Motion to Set Aside Default (Doc. # 71);

- **grant in part and deny in part** Defendants Buffington and Gaasche's (the "DEA Defendants") Motion to Dismiss (Doc. # 36); and

- **deny** Defendant Sanders' Motion to Dismiss (Doc. # 69).

(Doc. # 81 at 46–47) On July 17, 2019, Defendant Sanders and the DEA Defendants

filed Objections (Doc. ## 88, 89) to the Recommendation, and Plaintiffs Gregory

Boudette and Gary Mickelson filed Responses (Doc. ## 92, 93) to the Objections on July 31, 2019. Additionally, Plaintiffs filed a Motion to Amend Complaint (Doc. # 90) that pertains to some of Magistrate Judge Hegarty's findings in the Recommendation. For the reasons that follow, the Court affirms the Recommendation in part and rejects it in part.

## I.    BACKGROUND

The Magistrate Judge's Recommendation provides a recitation of the factual and procedural background of this dispute and is incorporated herein by reference. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). Accordingly, this Order will reiterate only what is necessary to address Defendants' objections.

This case arises from a United States Drug Enforcement Administration ("DEA") investigation that involved Plaintiffs' cultivation and distribution of marijuana. The investigation, which lasted from January 2016 to January 2017, was led by former DEA Task Force Officer Matt Buffington and supervised by former DEA Resident in Charge, Glenn Gaasche. During the course of the investigation, the DEA obtained information, in part, from Defendant Shawn Sanders, who is a private citizen. *See* (Doc. # 1 at 2). The investigation ultimately led to the seizure of various items which were held in the custody of the City of Cortez Police Department, where Defendant Tom Quinnett is employed. (*Id*. at 3.)

Plaintiffs' Complaint indicates that from 2010 to 2016, Plaintiff Mickelson and his son Christopher "grew medical marijuana in compliance with applicable Colorado law for themselves under their own physician's recommendations, and as registered care

givers for other qualified Colorado medical marijuana users." (*Id*.) The marijuana was "cultivated, possessed and stored at a farm located in Montezuma County, Colorado." (*Id*.) However, the DEA suspected that Plaintiffs were illegally distributing marijuana across state lines.

Accordingly, on December 9, 2016, Defendant Buffington submitted a Search Warrant Affidavit to the County/District Court of Montezuma County. (Doc. # 36-2 at 4–15.) The affidavit described the DEA's investigation in detail and sought a search warrant authorizing the search of Plaintiffs' marijuana operation site. Judge JenniLynn Everett Lawrence determined that, based on the affidavit, there was sufficient probable cause for a warrant to issue. Consequently, the judge issued a search warrant ("December 9, 2016 Search Warrant") permitting law enforcement to seize marijuana and evidence of marijuana distribution from the farm. (Doc. # 36-2 at 2–3.) Law enforcement officers executed the December 9, 2016 Search Warrant on December 13, 2016, and they seized various items from Plaintiffs' marijuana operation.

Defendant Buffington submitted additional Search Warrant Affidavits on January 9, 2017, and February 6, 2017. (Doc. # 36-4 at 4–20; Doc. # 36-5 at 4–18.) The affidavits sought authorization to search various electronic devices that belonged to Plaintiffs. After determining that there was adequate probable cause, Judge Lawrence issued search warrants ("January 9, 2017 Search Warrant" and "February 6, 2017 Search Warrant") based on each affidavit. (Doc. # 36-4 at 2–3; Doc. # 36-5 at 2–3.)

The investigation led to Plaintiff Mickelson and his son's arrest. Christopher Mickelson pled guilty to a marijuana-related offense, but the District Attorney's Office

ultimately dismissed the charges against Plaintiff Mickelson. Subsequently, Plaintiffs

initiated the instant action raising the following six claims for relief:

- **Claim 1** – "Illegal Search" – Plaintiffs allege Defendant Buffington impermissibly conducted an aerial search of the marijuana operation;

- **Claim 2** – "Illegal Search and Seizure" – Plaintiffs allege Defendant Buffington included false information in his December 9, 2016 Search Warrant Affidavit, the Search Warrant was impermissibly broad, and various items that were seized were outside the scope of the warrant;

- **Claim 3** – "Illegal Arrest" – Plaintiffs allege that Plaintiff Mickelson's arrest warrant was based on false information;

- **Claim 4** – "Malicious Prosecution to Deny Rights" – Plaintiffs allege that the DEA Defendants conspired to deprive Plaintiff Mickelson of constitutional rights by causing the District Attorney's Office to file false charges;

- **Claim 5** – "Illegal Seizure" – Plaintiffs allege that Defendant Quinnett wrongfully withheld some of Plaintiff Boudette's property;

- **Claim 6** – "Illegal Seizure" – Plaintiffs allege that Defendant Buffington included false information in his January 9, 2017, and February 6, 2017 Search Warrant Affidavits.

(Doc. # 1 at 8–26.)

Defendants Tom Quinnett and the City of Cortez filed a Motion to Dismiss

Plaintiffs' claims against them on November 11, 2018. (Doc. # 22.) Additionally, the

DEA Defendants filed a Motion to Dismiss on December 18, 2018 (Doc. # 36), and

Defendant Sanders filed a Motion to Dismiss on February 12, 2019 (Doc. # 69).

## II.    LEGAL STANDARDS

### A.    REVIEW OF A RECOMMENDATION

When a magistrate judge issues a recommendation on a dispositive matter,

Federal Rule of Civil Procedure 72(b)(3) requires that the district judge "determine *de*

*novo* any part of the magistrate judge's [recommended] disposition that has been properly objected to." An objection is properly made if it is both timely and specific. *United States v. One Parcel of Real Property Known As 2121 East 30th Street*, 73 F.3d 1057, 1059 (10th Cir. 1996). In conducting its review, "[t]he district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

In the absence of a timely objection, however, "the district court may review a magistrate [judge's] report under any standard it deems appropriate." *Summers v. Utah*, 927 F.2d 1165, 1167 (10th Cir. 1991) (citing *Thomas v. Arn*, 474 U.S. 140, 150 (1985) (stating that "[i]t does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings.")).[1]

## B.   *PRO SE* PLAINTIFF

Plaintiffs proceeds *pro se*. The Court, therefore, reviews their pleading "liberally and hold[s] [it] to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted). However, a *pro se* litigant's "conclusory allegations without supporting factual averments are insufficient

---

[1] The Court notes that none of the parties have objected to Magistrate Judge Hegarty's Recommendation to the extent that it concludes that: the DEA Defendants' Motion to Dismiss should be granted in part and that Claim 1 should be dismissed against Defendant Gaasche; Defendants Quinnett and the City of Cortez's Motion to Dismiss should be granted; and Defendant Sanders' Motion to Set Aside Entry of Default should be granted. (Doc. # 81 at 46.) After reviewing the Recommendation with respect to those findings, in addition to applicable portions of the record and relevant legal authority, the Court is satisfied that the Recommendation is sound and not clearly erroneous or contrary to law. *See* Fed. R. Civ. P. 72(a). Accordingly, the Court affirms and adopts the Recommendation's findings and conclusions regarding each of the Motions (Doc. ## 22, 36, 71).

to state a claim upon which relief can be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). A court may not assume that a plaintiff can prove facts that have not been alleged, or that a defendant has violated laws in ways that a plaintiff has not alleged. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983); *see also Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997) (a court may not "supply additional factual allegations to round out a plaintiff's complaint"); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) (a court may not "construct arguments or theories for the plaintiff in the absence of any discussion of those issues"). Nor does *pro se* status entitle a litigant to an application of different rules. *See Montoya v. Chao*, 296 F.3d 952, 957 (10th Cir. 2002).

## C. FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall*, 935 F.2d at 1198. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is **plausible** on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The *Iqbal* evaluation requires two prongs of analysis. First, the court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusion, bare assertions, or merely conclusory. *Id*. at 679–81. Second, the Court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id*. at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id*. at 679.

However, the court need not accept conclusory allegations without supporting factual averments. *Southern Disposal, Inc. v. Texas Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Nor does the complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.* (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (citation omitted).

### III.    DISCUSSION

The DEA Defendants object to the Recommendation's finding that their Motion to Dismiss (Doc. # 36) should be denied in part. Additionally, Defendant Sanders objects

to the Recommendation's finding that his Motion to Dismiss (Doc. # 69) should be denied. The Court will address each objection separately. The applicable standard of review is *de novo*.

## A.     THE DEA DEFENDANTS' OBJECTION

The DEA Defendants are nominally implicated in Claims 1–4 and 6 of Plaintiffs' Complaint. *See* (Doc. # 1). In their underlying Motion to Dismiss, the DEA Defendants sought to dismiss all of Plaintiffs' claims against Defendant Gaasche—i.e., Claims 1–4 and 6. (Doc. # 36 at 1.) Additionally, the DEA Defendants sought to dismiss Claims 2–4 and 6 against Defendant Buffington. (*Id*.) Thus, although the DEA Defendants challenged Claim 1 as it applies to Defendant Gaasche, they did not argue that it should be dismissed insofar as the claim applies to Defendant Buffington. More specifically, the DEA Defendants raised the following arguments:

- Following the Supreme Court's decision in *Ziglar v. Abbasi*, there is no Bivens remedy for malicious prosecution [Claim 4];

- The DEA Defendants are entitled to qualified immunity from the illegal search and seizure, false arrest, and malicious prosecution claims in [Claims] 2, 3, 4, and . . . 6;

- Plaintiffs fail to adequately allege the personal involvement of Defendant Gaasche in any count.[2]

(Doc. # 36 at 6.)

---

[2] The DEA Defendants also raised arguments regarding Claim 5, but it is undisputed that the DEA Defendants are not named in Claim 5. (Doc. # 81 at 24–25.) Accordingly, the Court will not address those arguments in this Order.

With respect to the DEA Defendants' arguments, Magistrate Judge Hegarty concluded that the DEA Defendant's Motion should be granted in part and denied in part. Specifically, the magistrate judge found that:

- Plaintiffs **fail to allege** [Defendant] Gaasche's personal participation for the "illegal search" set forth in Claim [1] and the "illegal search and seizure" described in Claim [2];

- Plaintiffs **have plausibly pled** [Defendant] Gaasche's personal participation for Claims [3, 4, and 6];

- Defendants Buffington and Gaasche have **failed to demonstrate** [that] they are entitled to qualified immunity as to Claims [2] (against Buffington only), [3, 4, and 6]; and

- **Plaintiffs are not precluded** by the Supreme Court's opinion in *Ziglar* from alleging a malicious prosecution claim against the [DEA] Defendants in violation of the Fourth Amendment.

(Doc. # 81 at 24–37) (emphasis added) (footnote omitted).

In their Objection to the Recommendation, the DEA Defendants raise three principal arguments. Specifically, the DEA Defendants assert:

- The Recommendation erred in determining that, in evaluating the claim of qualified immunity, the Court could not consider certain documents central to the Complaint;

- The Recommendation applied the wrong analysis in deciding to recognize a new *Bivens* claim; and

- The Recommendation erred in finding that the Complaint sufficiently alleged Defendant Gaasche's personal participation in the alleged wrongful conduct.[3]

---

[3] The Court took the liberty of paraphrasing the DEA Defendants' third argument. For purposes of readability, the Court chose to make that clear in the instant footnote as opposed to using brackets in the body of the text.

(Doc. # 89 at 2–3.) Before turning to the question of whether the DEA Defendants are entitled to qualified immunity (Claims 2 and 6), the Court will consider the DEA Defendants' argument regarding the impact of the Supreme Court's decision in *Ziglar* (Claims 3[4] and 4).

      1.    <u>Whether a Plaintiff May Assert a *Bivens* Claim for Malicious Prosecution in Light of the Supreme Court's Decision in *Ziglar*</u>

Magistrate Judge Hegarty concluded that the Supreme Court's decision in *Ziglar* does not preclude Plaintiffs from raising a malicious prosecution claim under *Bivens*. The DEA Defendants argue that a proper interpretation of the standard established in *Ziglar* requires the conclusion that Plaintiffs are, in fact, precluded from raising such a claim. The Court agrees with the DEA Defendants.

      a.    *Legal standard*

In *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), the Supreme Court "held that a right of action to enforce the fourth amendment affirmatively *does* exist, even though neither the fourth amendment itself nor any statute enacted by Congress expressly says as much." LARRY W. YACKLE, <u>Federal Courts</u> 260 (3d ed. 2009) (citing *Bivens*, 403 U.S. at 395–97). Since 1971, the Supreme Court has only expanded the scope of *Bivens* twice. *See Davis v. Passman*, 442 U.S. 228 (1979) (involving Fifth Amendment due process); *see also Carlson v. Green*, 446 U.S. 14

---

[4] In Plaintiffs' Complaint, Claim 3 is titled, "Illegal Arrest," and Claim 4 is titled, "Malicious Prosecution to Deny Rights." (Doc. # 1 at 14, 17.) Its title notwithstanding, however, Claim 3 is also a malicious prosecution claim because it involves an arrest based on a warrant. *Margheim v. Buljko*, 855 F.3d 1077, 1085 (10th Cir. 2017) ("Unreasonable seizures imposed *without* legal process precipitate Fourth Amendment false imprisonment claims. Unreasonable seizures imposed *with* legal process [i.e., a warrant] precipitate Fourth Amendment malicious-prosecution claims." (citation omitted)).

(1980) (involving the Eighth Amendment). However, the Supreme Court subsequently "severely curtailed its willingness to entertain *Bivens* claims." Daniel B. Rice & Jack Boeglin, Confining Cases to Their Facts, 105 VA. L. REV. 865, 882 (2019). In fact, Justice Scalia and Justice Thomas have "repeatedly invited the Court to confine *Bivens* and its progeny to their facts." *Id*. at 883 (citations omitted). "The Court all but accepted this invitation in *Ziglar v. Abbasi* . . . ." *Id*.

In *Ziglar*, the Supreme Court observed that *Bivens* was decided during a "*ancien regime*," in which "the Court assumed it to be a proper judicial function to 'provide such remedies as are necessary to make effective' a statute's purpose." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) (citations omitted). Although it did not repudiate its holding in *Bivens*, the Court unambiguously indicated that it no longer endorses such an approach, noting that "the Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Id*. at 1857 (citation omitted). In fact, the Court went so far as to comment that, "in light of the changes to the Court's general approach to recognizing implied damages remedies, it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today." *Id*. at 1856.

Commentators have observed that the Court's "stark disavowals bear the hallmarks of repudiation. But rather than directly prohibiting lower courts from applying *Bivens* in previously unrecognized contexts, the . . . Court adopted a test that achieves a virtually identical result." Rice & Boeglin, *supra*, at 883. The test involves two steps. At step one, courts must determine whether a claim presents a "new *Bivens* context." *Ziglar*, 137 S. Ct. at 1859. If courts answer that question in the affirmative, the analysis

moves to step two, which requires a determination of whether there are "special factors counselling hesitation in the absence of affirmative action by Congress." *Id*. at 1857 (citation omitted). If such factors exist, courts should not extend "a *Bivens*-type remedy" to the claims at issue. *Id*. at 1859.

Additionally, the Court provided guidance as to how each step should be applied. With regard to step one—i.e., whether a claim presents a new *Bivens* context—the Court held that "[i]f the case is **different in a meaningful way** from previous *Bivens* cases decided by [the Supreme] Court, then the context is new." *Id*. (emphasis added). By way of example, the Court noted that:

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id*. at 1860. The last category—i.e., the consideration of **potential** special factors that previous *Bivens* cases did not consider—illustrates the sweeping breadth of the new context inquiry. The catch-all category "can be read as a further invitation to distinguish cases," such that claims will often qualify as presenting a new context. *Constitutional Remedies—Bivens Actions—Ziglar v. Abbasi*, 131 Harv. L. Rev. 313, 318 (2017) (citing Larry Alexander, <u>Constrained by Precedent</u>, 63 S. Cal. L Rev. I, 20 (1989) (observing that if a court "could escape the constraint of a precedent rule by citing *any* factual distinctions," "the precedent would have little force indeed.")).

With regard to the first step of the test, the Court indicated that "even a modest extension is still an extension," and even if the differences are "perhaps small, at least in practical terms," the "new context inquiry is **easily satisfied**." *Ziglar*, 137 S. Ct. at 1864, 1865 (emphasis added). Additionally, the context may be different "[e]ven though the right and the mechanism of injury [are] the same . . . ." Thus, a single meaningful difference in "almost parallel circumstances" is sufficient to satisfy the first step of the *Ziglar* test. *Id*. at 1860 (finding contexts to be different where two cases both involved a claim for failure to provide adequate medical treatment under the Eighth Amendment, but one case involved federal prison officials and the other involved a private prison operator).

With regard to step two of the test—i.e., whether there are special factors counseling hesitation—the Court instructed that:

> the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action. Thus, to be a "special factor counselling hesitation," **a factor must cause a court to hesitate** before answering that question in the affirmative.

*Id*. at 1857–1858 (emphasis added). The Court reframed the "special factors" inquiry as a question of "'who should decide' whether to provide for a damages remedy, Congress or the courts?" *Id*. at 1857. The Court instructed that the "answer will most often be Congress." *Id*. Notably, courts do not need to reach a definitive answer as to whether the Judiciary is well suited to consider whether to allow a damages action—a mere hesitation is sufficient for a court to find that it should not allow such a remedy.

In applying step two, the Court indicated that, when lower courts conduct the "special factors" analysis, they should consider whether there are "alternative remedies available or other sound reasons to think Congress **might** doubt the efficacy or necessity of a damages remedy . . . ." *Id*. at 1865 (emphasis added) (internal quotation marks omitted). Additionally, the Court analyzed factors such as whether a claim implicates a governmental policy such that it would entail "inquiry and discovery into the whole course of the discussions and deliberations that led to the policies and governmental acts being challenged," and whether allowing a claim would "interfere in an intrusive way with sensitive functions of the Executive Branch." *Id*. at 1860–61.

Thus, step two of the *Ziglar* test creates a very low bar. When a case presents a "new *Bivens* context," there will "most often" be factors that will cause a court to hesitate before allowing a damages action. As a consequence, the Supreme Court's decision in *Ziglar* is "close to limiting the *Bivens* cause of action to the circumstances of *Bivens*, *Davis*, and *Carlson*, as it will be very difficult for any case not presenting those facts to survive [the *Ziglar*] test." <u>Constitutional Remedies</u>, *supra*, at 318. In fact, "it is unlikely that even *Bivens*, *Davis*, or *Carlson* would survive the [*Ziglar*] Court's test." *Id*. at 319.[5]

---

[5] The Court agrees with commentators who have stated that "[i]f the [Supreme] Court wants to continue distinguishing *Bivens*, for the sake of judicial candor and litigative efficiency it should hold that the *Bivens* cause of action is limited to the facts of *Bivens*, *Davis*, and *Carlson*." <u>Constitutional Remedies</u>, supra, at 313. The Court abstains from commenting further on the merits of the *Ziglar* test apart from offering the following quote from <u>The Charge of the Light Brigade</u> by Tennyson: "Was there a man dismayed? Not though the soldier knew Someone had blundered. Theirs not to make reply, Theirs not to reason why, Theirs but to do and die. Into the valley of Death Rode the six hundred."

       *b.*    *Analysis*

At issue is whether the *Ziglar* test precludes a malicious prosecution claim under *Bivens*. Given the strict nature of the test, the Court must answer the foregoing question in the affirmative.

For purposes of step one, Plaintiffs' malicious prosecution claim (Claim 4) differs in meaningful ways from the Supreme Court's previous *Bivens* cases. Plaintiffs allege that the DEA Defendants tampered with evidence and "conspired to deprive [Plaintiff] Mickelson of Constitutionally [sic] protected rights, privileges and immunities by causing District Attorney's Office [sic] to file charges that [the DEA Defendants] knew, or reasonable [sic] should have known, were . . . false." (Doc. # 1 at 18.) By contrast, *Bivens* involved "a claim against FBI agents for handcuffing a man in his own home without a warrant;" *Davis* involved "a claim against a Congressman for firing his female secretary;" and the only other recognized context involved "a claim against prison officials for failure to treat an inmate's asthma." *Ziglar*, 137 S. Ct. at 1860 (citations omitted).

The meaningful differences are legion. An exhaustive list is not necessary. The most notable difference is that Plaintiffs' malicious prosecution claim involves a considerable risk of "disruptive intrusion by the Judiciary into the functioning of other branches" because it requires an inquiry into the decision making of prosecutors and into the veracity of allegations underlying a prosecutor's decision to charge a defendant with a crime. *Id*. Additionally, Plaintiffs' claim "bear[s] little resemblance to the three

*Bivens* claims the [Supreme] Court has approved in the past . . . ." *Id*. Therefore, the claim involves a new context, and the Court must proceed to step two of the *Ziglar* test.

Special factors exist that cause the Court to hesitate before allowing Plaintiffs to maintain an action for damages against federal officials for malicious prosecution. Again, an exhaustive list is not necessary. It is sufficient for the Court to recognize that "Congress **might** doubt the efficacy or necessity of a damages remedy" because there is a risk that it would interfere with prosecutorial discretion, disincentivize law enforcement from sharing information with prosecutors, and disincentivize private citizens from sharing information with law enforcement. *Id*. at 1865 (emphasis added). Accordingly, the issue "involves a host of considerations that must be weighed and appraised," so "it should be committed to those who write the laws rather than those who interpret them." *Id*. at 1857 (citations and internal quotation marks omitted). Therefore, pursuant to *Ziglar*, the Court should not "extend a *Bivens*-type remedy" to Plaintiffs' malicious prosecution claim (Claim 4). *Id*. at 1859.[6]

2.  Qualified Immunity

Magistrate Judge Hegarty concluded that the DEA Defendants failed to demonstrate that they are entitled to qualified immunity. That conclusion was based on the following analysis:

- the DEA Defendants' qualified immunity argument depended on "contentions that Plaintiffs fail to state constitutional violations because the attached warrants and affidavits demonstrate that probable cause existed,"

---

[6] Because Claim 3 is also a malicious prosecution claim, *see supra* note 4, it is dismissed for the same reasons.

- but there is "no opinion in the Tenth Circuit allowing for consideration of a warrant and/or affidavit (allegedly containing false information), as opposed to the complaint's allegations, to make a probable cause determination under Rule 12(b)(6)."

(Doc. # 81 at 32) (footnote omitted). Accordingly, the magistrate judge determined that

> Because neither the parties nor the Court can cite to binding or persuasive authority demonstrating that a court may properly make "arguable probable cause" determinations from contested documents outside of the pleadings under Rule 12(b)(6), the Court cannot conclude at this stage of the litigation that Defendants are entitled to qualified immunity pursuant to the arguments presented.

(*Id*. at 33.) The DEA Defendants assert that the magistrate judge reached the foregoing conclusion in error. The DEA Defendants argue that courts may properly consider the materials at issue and that they are, in fact, entitled to qualified immunity. *See generally* (Doc. # 89). Again, the Court agrees with the DEA Defendants.

> a. *Whether a court may properly make "arguable probable cause" determinations from documents outside of the pleadings under Rule 12(b)(6)*

"Generally, the sufficiency of a complaint must rest on its contents alone." *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (citation omitted). The Tenth Circuit has recognized several "exceptions to this restriction on what the court can consider, but they are quite limited . . . ." *Id*. The exceptions are as follows: "(1) documents that the complaint incorporates by reference; (2) documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity; and (3) matters of which a court may take judicial notice." *Id*. (citations and internal quotation marks omitted). If a district court intends to rely evidence outside the scope of one of the exceptions, then the court "must convert the

Rule 12(b)(6) motion to a motion for summary judgment, giving proper notice to the parties." *Id*. (citations omitted).

In the instant case, Plaintiffs' Complaint challenges various warrants and the affidavits on which the warrants were based. *See* (Doc. # 1 at 11, 12, 16, 23, 24). Specifically, Plaintiffs assert that parts of the supporting affidavits were false, and that the warrants were constitutionally defective. The DEA Defendants attached those documents to their Motion to Dismiss. *See* (Doc. # 36). At issue is whether the Court may consider those documents in deciding the DEA Defendants' Motion without converting the Motion to one governed by Rule 56 of the Federal Rules of Civil Procedure. The Court answers the foregoing question in the affirmative.

It is undisputed that the documents referenced in the Complaint are central to Plaintiffs' claims. Additionally, Plaintiffs did not challenge the documents' authenticity— i.e., "that the item is what the proponent claims it is." Fed. R. Evid. 901. Rather, Plaintiffs dispute the veracity of the assertions within the documents. Moreover, the documents are conducive to judicial notice because they are part of the public record of Plaintiff Mickelson's criminal case. *See, e.g.*, *Hodgson v. Farmington City*, 675 F. App'x 838, 841 (10th Cir. 2017) (federal district court may consider another court's publicly filed records "concerning matters that bear directly upon the disposition of the case at hand" without converting a motion to dismiss to a motion for summary judgment. (quoting *United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007))); *Eckert v. Dougherty*, 658 F. App'x 401, 404 (10th Cir. 2016) (court took judicial notice of warrant application and search warrant **even though** the documents were not submitted by the

plaintiff while conducting a *de novo* review of a motion to dismiss based on qualified immunity); *Rathbun v. Montoya*, 628 F. App'x 988, 990 n.2 (10th Cir. 2015) (considering motion to dismiss based on qualified immunity *de novo* and drawing "facts from the search warrant and the affidavit in support of the search warrant, both of which are referenced in the amended complaint." (citation omitted)).

Accordingly, the Court may consider the documents that the DEA Defendants submitted with their Motion to Dismiss without converting the Motion to a motion for summary judgment.

       *b.      Whether the DEA Defendants are entitled to qualified immunity*

"[Q]ualified immunity . . . is both a defense to liability and a limited 'entitlement not to stand trial or face the other burdens of litigation.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Public officials are entitled to qualified immunity "in civil actions that are brought against them in their individual capacities and that arise out of the performance of their duties." *Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 864 (10th Cir. 2016) (quoting *Pahls v. Thomas*, 718 F.3d 1210, 1227 (10th Cir. 2013)). Once an official has raised qualified immunity as a defense, the plaintiff must show that: "(1) the public official violated the plaintiff's constitutional rights; and (2) these rights were clearly established at the time of the alleged violation." *Id.* (citation omitted). Courts may consider each factor in the "sequence [the court] deems best in light of the circumstances of the particular case." *Mink v. Knox*, 613 F.3d 995, 1000 n.4 (10th Cir. 2010). The qualified immunity standard, "by design, 'gives government officials breathing room to make reasonable but mistaken

judgments about open legal questions.'" *Pahls*, 718 F.3d at 1227 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011)).

The DEA Defendants raise the defense of qualified immunity with respect to Claims 2, 3, 4, and 6 of Plaintiffs' Complaint. (Doc. # 89 at 12.) However, in Section III(A)(1)(b), the Court determined that Claims 3 and 4 are precluded by the Supreme Court's decision in *Ziglar*. Therefore, the Court will consider whether the DEA Defendants are entitled to qualified immunity with respect to Claims 2 and 6.

In Claim 2, Plaintiffs assert that the DEA Defendants violated their Fourth Amendment rights. Specifically, Plaintiffs allege that the DEA Defendants obtained a search warrant by including allegedly false information in an affidavit. Additionally, Plaintiffs assert that the December 9, 2016 Search Warrant was constitutionally defective because it was overly broad. Finally, Plaintiffs claim that during the execution of the December 9, 2016 Search Warrant, the DEA Defendants impermissibly seized items that were outside the scope of the warrant. (Doc. # 1 at 9–14.)

In Claim 6, Plaintiffs similarly assert that their Fourth Amendment rights were violated, albeit by a different search and seizure. Specifically, Plaintiffs claim the DEA Defendants secured the January 9, 2017 Search Warrant and the February 6, 2017 Search Warrant based on affidavits allegedly containing various misrepresentations. Additionally, Plaintiffs appear to argue that their constitutional rights were violated because the DEA Defendants did not provide them with a copy of the warrants. (*Id*. at 23–26.)

First, the Court will consider whether the DEA Defendants are entitled to qualified immunity from Plaintiffs' claims regarding the alleged misrepresentations in the affidavits supporting the search warrants. Second, the Court will address the applicability of the defense to Plaintiffs' claims regarding the constitutionality of the scope of the December 9, 2016 Search Warrant and the items that were allegedly seized outside the warrant's scope. Third, the Court will consider whether the DEA Defendants are entitled to immunity from Plaintiffs' claim that the DEA Defendants allegedly failed to provide Plaintiffs with a copy of the January 9, 2017 Search Warrant and the February 6, 2017 Search Warrant.

        i.      *Alleged misrepresentations in the search warrant affidavits*

In order to determine whether a government official is entitled to qualified immunity with regard to an unlawful search claim, courts must "ascertain whether a defendant violated clearly established law by asking whether there was arguable probable cause for the challenged conduct." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) (quoting *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012)) (internal quotation marks omitted). Arguable probable cause is established if the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists. *Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007). Accordingly, a defendant "is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff." *Id.*

If a neutral magistrate issued a warrant, that is "the clearest indication that the officers acted in an objectively reasonable manner or . . . in 'objective good faith.'"

*Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citation omitted). However, the issuance of a warrant alone "does not end the inquiry into objective reasonableness." *Id.* If it is "'obvious that no reasonably competent officer would have concluded that a warrant should issue,' the warrant offers no protection." *Stonecipher*, 759 F.3d at 1142 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Thus, qualified immunity will not be granted "where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Messerschmidt*, 565 U.S. at 547 (internal quotation marks omitted).

Additionally, where, as here, a plaintiff claims that an officer misstated or omitted information when seeking a warrant, the officer is entitled to qualified immunity unless the plaintiff can make "a substantial showing of deliberate falsehood or reckless disregard for truth" by the officer. *Stonecipher*, 759 F.3d at 1142. However, a misrepresentation violates a plaintiff's Fourth Amendment rights only if it is material to the probable cause determination—i.e., the alleged misrepresentation must be "necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 156 (1978); *see, e.g.*, *United States v. Knittel*, 562 F. App'x 630, 635 (10th Cir. 2014) (*Franks* violation requires that "the affidavit, purged of its falsities, [is not] sufficient to support a finding of probable cause." (quoting *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997))).

Probable cause exists to support a search warrant when, "given all the circumstances set forth in the affidavit . . ., there is a **fair probability** that contraband or evidence of a crime will be found in a particular place." *United States v. Artez*, 389 F.3d

1106, 1111 (10th Cir. 2004) (emphasis added) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Probable cause does not require a showing of "proof beyond a reasonable doubt or by a preponderance of the evidence." *See id.* (quoting *Gates*, 462 U.S. at 235). Probable cause is not a rigid formula, but rather a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232.

Thus, an "affidavit in support of a search warrant must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." *United States v. Edwards*, 813 F.3d 953, 960 (10th Cir. 2015) (quoting *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000)). Courts must make a "practical, common-sense determination," *id.*, whether, under the totality of the circumstances presented in the affidavit, there is a "**substantial basis**" to conclude that "there is a **fair probability** that contraband or evidence of a crime will be found will be found in a particular place," *United States v. Long*, 774 F.3d 653, 658 (10th Cir. 2014) (emphases added) (quoting *Gates*, 462 U.S. at 236, 238); *cf. United States v. Martin*, 426 F.3d 68, 77 (2d Cir. 2005) ("The fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause.").

In the instant case, because Plaintiffs challenge the veracity of some of the allegations in the affidavits supporting the search warrants at issue, the Court must determine whether the warrants were supported by probable cause after setting aside the alleged falsehoods in the affidavits. In Claim 2, Plaintiffs challenge the December 9, 2016 Search Warrant. (Doc. # 36-2 at 4–15.) Additionally, in Claim 6, Plaintiffs

challenge the January 9, 2017 Search Warrant and the February 6, 2017 Search

Warrant. (Doc. # 36-4 at 4–20; Doc. # 36-5 at 4–18.) The Court will consider each

supporting affidavit in turn.

In their Complaint, Plaintiffs allege that the following facts in the December 9,

2016 affidavit were false:

- [Plaintiff] Mickelson and his son were associates of the Hell's Angles and the Russian Mob;

- [Plaintiff] Mickelson had filed a lawsuit against the Cortez Police Department relating to a methamphetamine manufacturing charge;

- Everyone at [Plaintiff] Mickelson's farm was armed at all times;

- [Plaintiff] Mickelson had solicited Sanders to transport marijuana to California;

- [Plaintiff] Mickelson's farm was used for winter grows;

- [There was] a connection between [Plaintiff] Mickelson and homicide victim Samuel Gordon;

- [Plaintiff] Mickelson offered Sanders $5,000 to transport marijuana to Arizona . . .;

- [Plaintiff] Mickelson would replant in mid-December and was awaiting an out-of-state buyer to sell the remaining marijuana at his farm; and

- . . . the size and construction of the greenhouses.

(Doc. # 1 at 11–12.) Additionally, Plaintiffs allege that the affidavit improperly omitted

the following:

- [Sanders'] criminal history, pending criminal charges, his confession to the crime of identity theft, and his incentives for being an informant. . . .

- Sanders had not been on [Plaintiff] Mickelson's farm for more than a year prior to the date of the affidavit;

- The SOI and the CS were the same person;

- Both [Plaintiff] Mickelson and his son had physician's recommendations for medical marijuana;

- [Plaintiff] Mickelson and his son were registered medical marijuana caregivers;

- The informant received money proceeds from the two controlled buys;

- [The DEA Defendants] conducted . . . aerial surveillance [unreasonably]; and

- Any corroboration of information provided by Sanders, a convicted felon and confessed identity thief.

(*Id*.) However, the affidavit also contains a substantial number of allegations that

Plaintiffs have not challenged. Most notably, the affidavit indicates:

- [Plaintiff Mickelson operates] a large-scale marijuana grow located between Cortez and Mancos, Colorado (34601 C.R. M, Mancos, Colorado) . . . owned and operated by [Plaintiff] and Chris Mickelson (father and son);

- [Plaintiff Mickelson's] criminal history [includes] numerous drug charges . . . ;

- Neither [Plaintiff] nor Christopher Mickelson list[ed] any wage information with their respected [sic] Social Security Numbers [in Colorado, Arizona, and California as of February 16, 2016, and November 10, 2016];

- The Edmond, Oklahoma Police Department and [DEA] Task Force Group II were involved in the arrest of two individuals for Conspiracy to Distribute and Distribution of Marijuana on May 11, 2016. Approximately 5.4 pounds of marijuana and 1.3 pounds of marijuana concentrate, nearly $20,000 UCS [sic] and two weapons were seized from a hotel room and related vehicle during the case. Investigators later determined that **the room in which the two individuals were staying was rented by [Plaintiff] Mickelson . . . [and Plaintiff] Mickelson also rented a second room, however he checked out earlier that day**.

(Doc. # 36-1 at 2–14) (emphasis added). Additionally, Plaintiffs do not dispute that Plaintiff Mickelson was recorded discussing his intent to hire someone to transport marijuana to Oklahoma—which is where he rented a room for individuals who were arrested for conspiring to distribute marijuana. *See* (*id.* at 7). Further, Plaintiffs do not dispute that—during the course of two controlled drug transactions conducted by the DEA which involved undercover officers—Plaintiff Mickelson's son and business associate illegally sold multiple pounds of marijuana to government officers. (*Id.* at 10–13.)

After excluding all the allegedly false information and considering the allegedly omitted information, the affidavit still supports a finding of probable cause. Juxtaposing Plaintiff Mickelson's prior drug-related offenses with his apparent attempt to organize a drug transaction in Oklahoma, there is a substantial basis for a neutral magistrate to conclude that "there is a **fair probability** that contraband or evidence of a crime" could be found where Plaintiff Mickelson was known to be growing a substantial amount of marijuana. *Artez*, 389 F.3d at 1111. Moreover, the possibility that Plaintiff Mickelson's marijuana operation was being used for criminal purposes is bolstered by the fact that Plaintiff Mickelson's son and business associate was, in fact, selling marijuana illegally. Therefore, the DEA Defendants are entitled to qualified immunity because it was far from "obvious that no reasonably competent officer would have concluded that a warrant should issue . . . ." *Stonecipher*, 759 F.3d at 1142 (citation omitted).

Turning to the January 9, 2017, and February 6, 2017 affidavits, the Court concludes that the DEA Defendants are entitled to qualified immunity for similar

reasons. In their Complaint, Plaintiffs assert that the "affidavits contained the same false and misleading information and material omissions as set forth in [Claim 2] . . . ." (Doc. # 1 at 23.) However, Plaintiffs additionally contend that Defendant Buffington: fabricated a story from an unnamed source of information; misrepresented that pre-civil war muskets are firearms; exaggerated his expertise; and made an unfounded claim that "he would probably find records of large bank deposits, in direct contradiction of his sworn statement in previous affidavits that these people transacted their business in cash." (*Id*. at 24.)

Even after excluding the allegedly false information, the January 9, 2017 and February 6, 2017 affidavits each support a finding of probable cause. The affidavits contain the same uncontested information that the Court has discussed above. Additionally, the affidavits include the unchallenged assertion that:

> Computers, electronic devices and computer data storage devices are commonly used by both marijuana cultivators/distributors and their customers when conducting business. Marijuana cultivators/distributors and their customers utilize computers, electronic devices and computer data storage devices for records keeping detailing sales and/or money owed, contact information for customers & employees and money laundering activities.

(Doc. # 36-4 at 19; Doc. # 36-5 at 17.) The foregoing assertion is bolstered by the undisputed fact that Plaintiff Boudette's thumb drives and computer were found in close proximity to both suspected marijuana and United States currency. (Doc. # 36-5 at 15.) Accordingly, there is a substantial basis for a neutral magistrate to conclude that "there is a **fair probability** that contraband or evidence of a crime" could be found on Plaintiffs' electronic devices that were specified in the affidavits. *Artez*, 389 F.3d at 1111. As a

consequence, the DEA Defendants are entitled to qualified immunity because it was far from "obvious that no reasonably competent officer would have concluded that a warrant should issue . . . ." *Stonecipher*, 759 F.3d at 1142 (citation omitted).

        ii.       *Scope of Dec. 9 warrant and items that were seized*

Plaintiffs allege that the December 9, 2016 Search Warrant was "Constitutionally [sic] defective" because it: authorized an overbroad search; failed to describe with particularity the items to be seized; authorized the seizure of cell phones and personal computers without mention of any related crime; authorized a general search of personal papers; and failed to state the grounds or probable cause for issuance or even the suspected crime. (Doc. # 1 at 12–13.)

The Fourth Amendment requires not only that warrants be supported by probable cause, but that they "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized." *United States v. Pulliam*, 748 F.3d 967, 972 (10th Cir. 2014) (internal quotation marks omitted). "Even a warrant that describes the items to be seized in broad or generic terms may be valid when the description is as specific as the circumstances and the nature of the activity under investigation permit." *United States v. Cooper*, 654 F.3d 1104, 1126 (10th Cir. 2011) (internal quotation marks omitted). Moreover, "the warrant may cross-referenc[e] other documents, such as an affidavit" in support of the application, "to satisfy the particularity requirement." *Id.* (citation omitted).

However, the Court need not decide whether the search warrant met the Fourth Amendment's particularity requirement because the Court concludes that the officers "are entitled to immunity from damages, even assuming that the warrant should not have been issued." *Messerschmidt*, 565 U.S. at 546. Where, as here, a defendant raises the defense of qualified immunity, "[t]he issue is not whether the magistrate erred in believing the search warrant he issued met the Fourth Amendment's particularity requirement, but instead whether the magistrate 'so obviously erred that any reasonable officer would have recognized the error.'" *Rathbun v. Montoya*, 628 F. App'x 988, 995–96 (10th Cir. 2015) (quoting *Messerschmidt*, 565 U.S. at 556). "[T]he threshold for establishing this exception is a high one," because a police officer ordinarily "cannot be expected to question the magistrate's [particularity] determination [given that] it is the magistrate's responsibility to determine whether the [warrant is sufficiently particular] and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment." *Id.* at 994 (quoting *Messerschmidt*, 565 U.S. at 547).

In the instant case, the December 9, 2016 Search Warrant explicitly referenced Defendant Buffington's Search Warrant Affidavit, and it described the property to be searched for and seized as follows:

> Marijuana, Marijuana plants, processed marijuana, gas extraction devices, weapons, cellular phones, tablets & electronic notebooks, large sums of United States currency, records of money transfers or deposits, receipts for items purchased, evidence of occupancy/ownership, receipts, paraphernalia for the use of marijuana, addresses, photos and video tapes, closed and locked containers, pay/owe sheets, ledgers, publications referencing marijuana and the use of or cultivation of marijuana and the search of any vehicles or persons on said property at the time of service for any of the above listed items.

(Doc. # 36-2 at 2.) When considered in conjunction with Defendant Buffington's supporting affidavit, "[t]he officers could reasonably have concluded that the warrant was sufficiently particular, even though it described [some of] the items to be seized in broad or generic terms, given the nature of the crimes under investigation." *See, e.g.*, *Rathbun*, 628 F. App'x at 994 (holding that officers could have reasonably relied on search warrant regarding, *inter alia*, a drug-related offense that included "[a]ll types of computers, tablets, scanner/printers, video or digital cameras, cell phones, and digital or magnetic storage of any kind . . . .").

Notably, the DEA Defendants were investigating what appeared to be a sophisticated and expansive scheme to illegally distribute substances across multiple states. *See generally* (Doc. # 36-2 at 4–15). Additionally, Defendant Buffington noted in the Search Warrant Affidavit that, during his 17 years as a narcotics investigator, he knew that:

> persons who distribute marijuana, in both large and small quantities, often have numerous items associated with such activities like scales, packaging materials & equipment, large sums of cash from sales, books and legers detailing sales of [sic] money owed, cellular phones for business contacts, computers, tablets & electronic notebooks for keeping records and contact information for customers/employees.

(*Id*. at 14.) The Search Warrant Affidavit also explains that large scale marijuana distributors often possess financial records related to money laundering activities, and they keep large sums of cash in safes or closed containers. (*Id*.)

Therefore, the affidavit provides meaningful details that justify the list of items to be seized in the warrant. Further, the nature of the alleged crime justifies describing some of the items to be seized in broad or generic terms. *Cooper*, 654 F.3d at 1127

("Warrants relating to more complex and far-reaching criminal schemes may be deemed legally sufficient even though they are less particular than warrants pertaining to more straightforward criminal matters." (citations omitted)); *United States v. Janus Indus.*, 48 F.3d 1548, 1554 (10th Cir. 1995) ("The type of criminal activity under investigation in the present case—a drug paraphernalia business—makes it difficult to list with great particularity the precise items desired to be seized which evidence such activity.").

As a consequence, the December 9, 2016 Search Warrant "was not so obviously lacking in [particularity] that the officers can be considered plainly incompetent for concluding otherwise." *Messerschmidt*, 565 U.S. at 556. In fact, "[r]eading the affidavit[ ] in conjunction with the search warrant[ ] enable[d] the searcher to reasonably ascertain and identify the things authorized to be seized." *Cooper*, 654 F.3d at 1127 (citation and internal quotation marks omitted).[7] Accordingly, the DEA Defendants are entitled to qualified immunity.

Plaintiffs' Complaint also alleges that their Fourth Amendment rights were violated by the seizure of various "items not enumerated in the search warrant . . . ." (Doc. # 1 at 13.) However, that argument is lacking in merit. Many of the referenced items—e.g., ammunition, six firearms, 18 marijuana plants, laptop computers, a cell phone, and papers regarding the marijuana operation—are clearly within the scope of the December 9, 2016 Search Warrant. (Doc. # 36-2 at 2–3) (authorizing execution of

---

[7] Given that the warrant and supporting affidavit enabled officers to reasonably identify the things that were authorized to be seized, it is very likely that the warrant was sufficiently particular for Fourth Amendment purposes. *See Cooper*, 654 F.3d at 1127.

warrant regarding, *inter alia*, marijuana plants, weapons, cellular phones, computers, evidence of occupancy/ownership, paraphernalia for the distribution of marijuana, etc.). Other items—e.g., light ballasts, a trimming machine, and kitchen scales—have a "reasonable nexus . . . to the criminal behavior alleged" because they could all be used to either grow marijuana or measure it.[8] *Shaffer v. Wilson*, 523 F.2d 175, 189 (10th Cir. 1975) (citation omitted).

The same reasoning applies to Plaintiffs' allegation that foreign currency was impermissibly seized. (Doc. # 1 at 13.) Assuming, *arguendo*, that the foreign currency was outside the scope of the warrant, the DEA Defendants are entitled to qualified immunity. "[A]n officer may, if on the premises pursuant to a valid warrant . . . seize items which immediately appear to be evidence or contraband of a crime." *United States v. Le*, 173 F.3d 1258, 1269 (10th Cir. 1999). Given that the warrant explicitly mentions "United States currency," it would be reasonable for an officer to conclude that foreign currency was also evidence of an allegedly illegal large-scale marijuana operation, especially because illicit drug operations often involve transactions with individuals from foreign countries.

As for the antique muskets which Plaintiffs assert were seized impermissibly, an officer could reasonably conclude that the muskets were operational firearms. Even if they were not within the scope of the warrant, an officer is "immune for a reasonable mistake of law, reasonable mistake of fact, or a reasonable mistake 'based on mixed

---

[8] Those items could also be reasonably considered to be paraphernalia for the distribution of marijuana and thus be within the scope of the warrant.

questions of law and fact.'" *Moeck v. City of Albuquerque*, 813 F.3d 912, 922 (10th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Moreover, Plaintiffs have not met their burden of showing that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. Therefore, the DEA Defendants are entitled to qualified immunity as to the claims involving the various items that were allegedly outside the scope of the warrant.

### iii.    Alleged failure to provide a copy of a search warrant

In Claim 6, Plaintiffs allege that the DEA Defendants failed to comply with the January 9, 2017, and February 6, 2017 Search Warrants' requirement to

> deliver to the person from whom the property is taken or from whose premises or vehicle the property is taken a copy of this Warrant together with a receipt for the property taken, or in lieu thereof, to leave the copy and receipt at the place from which the property is taken . . . .

*See* (Doc. # 1 at 25; Doc. ## 36-4, 36-5 at 3 (Search Warrants)). In the Complaint, Plaintiffs allege that the DEA Defendants violated their "right to be free from unreasonable search and seizure and their right to due process protected by the Fourth and Fourteenth Amendments . . . ." However, the Fourteenth Amendment does not apply to the federal government. U.S. CONST. amend XIV, § 1; *see, e.g.*, *Belhomme v. Windnall*, 127 F.3d 1214, 1217 n.4 (10th Cir. 1997). Therefore, the Court will address Plaintiffs' claim only insofar as it implicates the Fourth Amendment.

The particularity requirement of the Fourth Amendment not only protects against general searches, but it "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his search power." *Groh v. Ramirez*, 540 U.S. 551, 561 (2004). Thus, the Tenth Circuit has

held that an officer's failure to provide a copy of a warrant to the target of a search may constitute a violation of the Fourth Amendment. *See United States v. Pulliam*, 748 F.3d 967, 974 (10th Cir. 2014). Whether such a failure rises to the level of a constitutional violation depends on whether "the violation rendered the search unreasonable under the Fourth Amendment . . . ." *See Id.*[9]

Applying these standards to the instant case, the Court concludes that Plaintiffs have failed to state Fourth Amendment violation claim. Plaintiffs provide little support for their assertion that the DEA Defendants' alleged failure to provide them with a copy of the warrants at issue violated their constitutional rights. Plaintiffs merely indicate that they "were denied any opportunity to challenge the search prior to the unwarranted invasion of their privacy and the copying and distribution of their personal information." (Doc. # 1 at 25.) However, officers are not constitutionally obligated to provide an individual with an opportunity to challenge a warrant before a search takes place by tendering a copy of the warrant before initiating the search. *See Ramirez*, 540 U.S. at 562 n.5. Therefore, without more, Plaintiffs' allegations are insufficient to establish that

---

[9] In *Pulliam*, the Tenth Circuit indicated that evidence could be suppressed in a **criminal case** if a defendant shows **either** that the violation rendered a search unreasonable for purposes of the Fourth Amendment **or** if "the violation was intentional or resulted in prejudice." *Pulliam*, 748 F.3d at 974. However, in *United States v. Krueger*, 809 F.3d 1109, 1114 (10th Cir. 2015), the Tenth Circuit explained that the questions of intentionality and prejudice are distinct from whether there was a violation of the Fourth Amendment—i.e., intentionality and prejudice are not factors to be considered when courts analyze whether an individual's constitutional rights were violated. *Krueger*, 809 F.3d at 1114 ("If we determine that the Rule 41 violation [e.g., failure to provide a copy of a warrant] is *not* of constitutional import, we **then** consider [intentionality and prejudice]." (emphasis added)). Rather, the factors of intentionality and prejudice are relevant only to determine whether evidence should be suppressed in a **criminal case** even if there has been no constitutional violation. Accordingly, the Court will address only the potential Fourth Amendment violation.

the searches in their entirety were unreasonable. *Pulliam*, 748 F.3d at 974 (failure to provide complete copy of search warrant did not render search unreasonable because the warrant was supported by probable cause and was sufficiently particular). Because Plaintiffs have not made such a showing, they have not established a violation of their Fourth Amendment rights. Accordingly, the DEA Defendants are entitled to qualified immunity.

## B. DEFENDANT SANDERS' OBJECTION

In Defendant Sanders' underlying Motion to Dismiss, he argued that Plaintiffs "fail to state any cognizable claim against [him] as a matter of law." (Doc. # 69 at 2.) Specifically, Defendant Sanders asserted that:

- Plaintiffs state no cognizable *Bivens* claim against [Defendant Sanders] as a matter of law; and

- Plaintiffs do not even allege [Defendant Sanders] acted under color of state law.

(Doc. # 69 at 2, 5.)

With respect to Defendant Sanders' arguments, Magistrate Judge Hegarty concluded that Defendant Sanders' Motion should be denied. Specifically, the Magistrate Judge found that

- Plaintiffs **plausibly allege** [Defendant] Sanders acted jointly with and under the direction of the DEA task force, including [Defendants] Buffington and Gaasche . . . [which] fall[s] into the same "standard law enforcement operation" as that recognized in *Bivens*; [and therefore,]

- Plaintiffs **plausibly allege** [Defendant] Sanders acted under federal law for their *Bivens* claims and participated in the conduct supporting their Fourth Amendment Claims.

(Doc. # 81 at 44–46.) The magistrate judge did not resolve the question of whether

Plaintiffs have stated an independent claim against Defendant Sanders pursuant to

Section 1983.

In his Objection to the Recommendation, Defendant Sanders raises three

principal arguments. Specifically, Defendant Sanders asserts that:

- Plaintiffs fail to allege [Defendant] Sanders acted under color of state law to support claims under Section 1983;

- Per *Ziglar*, [courts] cannot find liability [under *Bivens*] without first determining whether there is a legal precedent allowing for such liability to attach to the category of private actor defendant at issue . . .;[10]

- Plaintiffs state no action or omission by [Defendant] Sanders through his own personal participation causing any violation of Plaintiffs' constitutional rights.

(Doc. # 88 at 3, 5.) The Court analyzes Defendant Sanders' first and second arguments

in turn and concludes that Plaintiffs have failed to state a claim against him pursuant to

either Section 1983 or *Bivens*. Therefore, the Court abstains from reaching the third

argument.

1.  Plaintiffs Fail to State a Claim Against Defendant Sanders Pursuant to Section 1983

Section 1983 of Title 42 of the United States Code provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia,

---

[10] The Court notes that the title of Defendant Sanders' second argument is actually, "Mr. Sanders' pleaded status as a confidential informant is insufficient to demonstrate he acted under federal law under *Bivens* . . . ." (Doc. # 88 at 3.) However, as Defendant Sanders observes in his brief, whether a *Bivens* claim exists is a predicate question which must be answered in the affirmative before it is appropriate to consider whether Defendant Sanders acted under color of federal law. Accordingly, the Court considers the former question to be the essence of Defendant Sanders' second argument.

subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of **state law**." *West v. Atkins*, 487 U.S. 42, 48 (1988) (emphasis added). Importantly, § 1983 is "not directed at conduct by federal officials." *Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 869 (10th Cir. 2016); *see, e.g.*, *Dotson v. Griesa*, 398 F.3d 156, 162 (2d Cir. 2005); *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 n.4 (2d Cir. 1991) ("An action brought pursuant to 42 U.S.C. § 1983 cannot lie against federal officers."). Rather, it provides a remedy against state actors who violate a federal right, pursuant to state authority. *Id*. (citation omitted).

However, in some limited cases, federal officials may act under "color of state law" for purposes of § 1983. *Big Cats*, 843 F.3d at 869. "The paradigmatic example is when federal officials conspire with state officials to infringe a protected constitutional right." *Id*. (citation omitted). "Most courts agree that conspiracy with state actors is a requirement to finding that federal actors jointly acted under color of state law." *Id*. (citing *Strickland ex rel. Strickland v. Shalala*, 123 F.3d 863, 866–67 (6th Cir. 1997)) ("[C]ourts finding that a *federal* official has acted under color of state law have done so only when there is evidence that federal and state officials engaged in a conspiracy or 'symbiotic' venture to violate a person's rights under the Constitution or federal law.").

In the instant case, Plaintiffs have not demonstrated that Defendant Sanders acted under "color of state law." It is undisputed that Defendants Gaasche and Buffington[11] were members of a DEA task force. Where, as here, officers act in their capacity as DEA task force agents, they are acting pursuant to federal law. *Pou v. U.S. Drug Enf't Admin.*, 923 F. Supp. 573, 579 (S.D.N.Y. 1996) (citation omitted), *aff'd sub nom. Pou v. Loszynski*, 107 F.3d 3 (2d Cir. 1997). Therefore, because Defendant Sanders was a confidential informant for Defendants Gaasche and Buffington, Plaintiffs can, "at best claim that [he] is a federal actor, and so [they are] left without a foothold in § 1983."[12] Therefore, because Plaintiffs do not allege that there was an illegal conspiracy between state and federal actors, Plaintiffs have failed to state a § 1983 claim against Defendant Sanders.

---

[11] The Court notes that Defendant Buffington was employed as a local state police investigator who was assigned to the DEA task force. When DEA task forces include local law enforcement personnel, members of the task force act pursuant to federal—not state—law. *See, e.g.*, *Ochoa v. Bratton*, No. 16-CV-2852 (JGK), 2017 WL 5900552, at *6 (S.D.N.Y. Nov. 28, 2017) (joint task force that included members of the Drug Task Force of the City of New York and the DEA acted pursuant to federal law); *Guerrero v. Scarazzini*, 274 F. App'x 11, 12 (2d Cir. 2008) (local law enforcement officers who were federally deputized for work with FBI task force acted pursuant to federal law); *Pou*, 923 F. Supp. at 579 (New York State Police Officers acting as part of a DEA task force were not acting under color of state law).

[12] The Court seriously doubts that Defendant Sanders—who is a private citizen—could be considered a state (or federal) actor notwithstanding the fact that he was a confidential informant for law enforcement. *See, e.g.*, *Landor v. Strain*, No. CIV.A. 08-4647, 2009 WL 426271, at *4 (E.D. La. Feb. 17, 2009) (confidential informant could not be a "state actor" as a matter of law); *Nelson v. Louise*, No. CIV.A. 10-827-JJB-RL, 2014 WL 5364050, at *13 (M.D. La. Oct. 21, 2014) (same).

2.    <u>Per *Ziglar*, Plaintiffs Fail to State a *Bivens* Claim Against Defendant Sanders</u>

The Court recounted the *Ziglar* test in Section III(A)(1)(a). To reiterate, when a court is presented with a *Bivens*-type claim, *Ziglar* instructs that the court must determine whether that claim arises in a "new context." If it does, and if special factors cause the court to hesitate before allowing an action for damages, the court should not recognize the claim. Applying that test to Plaintiffs' allegations against Defendant Sanders, the Court concludes that Plaintiffs have failed to state a *Bivens*-type claim.

Defendant Sanders is a private individual—i.e., he is not employed as a law enforcement officer or any other type of governmental employee. That fact alone shows that Plaintiffs' allegations against Defendant Sanders bear even less "resemblance to the three *Bivens* claims the [Supreme] Court has approved in the past" than Plaintiffs' precluded malicious prosecution claims. *Ziglar*, 137 S. Ct. at 1860. Therefore, Plaintiffs' allegations arise in a new context, and the Court must proceed to step two of the *Ziglar* test.

As with Plaintiffs' malicious prosecution claims, special factors exist that cause the Court to hesitate before allowing Plaintiffs' damages claims against Defendant Sanders to proceed. Congress "**might** doubt the efficacy or necessity of a damages remedy" because there is a risk that private individuals would be less likely to cooperate with law enforcement if they could be exposed to personal liability for their assistance. *Id*. at 1865 (emphasis added). Moreover, because Defendant Sanders is a private individual, Plaintiffs may raise state tort claims against him for any harm he is alleged to have caused. Importantly, the Supreme Court has held that "if there is an alternative

remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id*. at 1868. Therefore, pursuant to *Ziglar*, the Court should not "extend a *Bivens*-type remedy." *Id*. at 1859. Accordingly, Plaintiffs have failed to state a *Bivens*-type claim against Defendant Sanders.

## IV.   CONCLUSION

Based on the foregoing, the Court ORDERS as follows:

1. The June 28, 2018 Recommendation of United States Magistrate Judge (Doc. # 81) is AFFIRMED IN PART and REJECTED IN PART;

2. Defendants Tom Quinnett and the City of Cortez's Motion to Dismiss (Doc. # 22) is GRANTED;

3. The DEA Defendants' Motion to Dismiss (Doc. # 36) is GRANTED;

4. Defendant Shawn Sanders' Motion to Dismiss (Doc. # 69) is GRANTED;

5. Accordingly, **Claim 1** is DISMISSED WITHOUT PREJUDICE as against Defendant Gaasche, but not Defendant Buffington. Thus, **Claim 1** remains pending against Defendant Buffington. **Claim 5** is DISMISSED WITHOUT PREJUDICE for the reasons stated in the Recommendation (Doc. # 81 at 21);

6.  **Claims 2–4 and 6** are DISMISSED WITH PREJUDICE. The claims are dismissed with prejudice because it is "obvious that [Plaintiffs] cannot prevail on the facts [they] allege and it would be futile to give [them] opportunity to amend." *Guy v. Lampert*, 748 F. App'x 178, 181 (10th Cir. 2018) (quoting *Gee v. Pacheco*, 627 F.3d 1178, 1195 (10th Cir. 2010));

7. Defendant Shawn Sanders' Motion to Set Aside Entry of Default (Doc. # 71) is GRANTED;

8. Plaintiffs' Motion to Amend (Doc. # 90) is DENIED WITHOUT PREJUDICE. Plaintiffs shall file an Amended Complaint that cures the defects in the claims that have been dismissed without prejudice (Claim 1 against Defendant Gaasche and Claim 5) on or before September 19, 2019. If Plaintiffs do not do so, the claims that have been dismissed without prejudice will be dismissed with prejudice.

DATED: August 19, 2019

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge